IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GWENDOLYN M. STUBBS, <u>et al</u>., | : | CIVIL ACTION NO. 3:CV-03-2362 |
| | : | |
| Plaintiffs | : | (JUDGE JONES) |
| | : | |
| v. | : | |
| | : | |
| DOMINICK DeROSE, <u>et al</u>., | : | |
| | : | |
| Defendants | : | |

## <u>MEMORANDUM</u>

### March 12, 2007

Gwendolyn Stubbs ('Stubbs"), an inmate, who at all times relevant to the complaint was incarcerated at the Dauphin County Prison, filed the instant counseled civil rights action pursuant to 42 U.S.C. § 1983.  Stubbs seeks damages and injunctive relief for violations of her First, Fourth, Eighth and Fourteenth Amendment rights, as well as constitutional violations of her minor son, Cleo Stubbs, who was born in the Dauphin County Prison.  (Doc. 1).  Named as defendants are Warden Dominick DeRose ("DeRose"), Deputy Warden Elizabeth Nichols ("Nichols"), Corrections Officer Walizer ("Walizer"), Chaplain Calvin Favers[1] ("Favers") and five John Doe defendants.

---

[1] This Defendant is incorrectly referred to throughout the complaint as Calvin Favor.  As stated in the Defendant's motion to dismiss, the correct spelling of this Defendant's name is Calvin Favers.

By previous Orders of Court, Defendants DeRose, Nichols and all John Doe Defendants were dismissed from the action; all claims of sexual harassment and/or assault occurring prior to December 23, 2001 were dismissed as statutorily barred; and all claims against Defendants Walizer and Favers, with the exception of Plaintiff's Eighth Amendment claim, were dismissed. (Docs. 11, 22 ).

Presently before the Court are separate motions for summary judgment filed by Defendant Favers and Defendant Walizer. (Docs. 25, 28). The motions are fully briefed and are ripe for disposition. For the reasons set forth below, the motions will be granted.

## I.   **Standard of Review**

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment " . . . forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. <u>Anderson</u>, 477 U.S. at 248; <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S. at 257; <u>Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America</u>, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. <u>Moore v. Tartler</u>, 986 F.2d 682 (3d Cir. 1993); <u>Clement v. Consolidated Rail Corporation</u>, 963 F.2d 599, 600 (3d Cir. 1992); <u>White v. Westinghouse Electric Company</u>, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some

metaphysical doubt as to the material facts." <u>Matsushita Electric Industrial Co. v. Zenith Radio</u>, 475 U.S. 574, 586 (1986).  When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323.  <u>See</u> <u>Harter v. G.A.F. Corp.</u>, 967 F.2d 846, 851 (3d Cir. 1992).

## II.   <u>Defendant Favers' Motion for Summary Judgment</u>

### A.   <u>Statement of Facts</u>

From the pleadings, depositions and exhibits submitted therewith, the following facts can be ascertained as undisputed.

Defendant Calvin Favers was employed by Christian Churches United as a full-time Chaplain.  (Doc. 35-2, Ex. 1, Favers Deposition at p. 93).  Christian Churches United contracted with the Dauphin County Prison to provide pastoral services to the inmate population.  (Id. and Doc. 35-4, Ex. 3, Warden DeRose Deposition at p. 4). Christian Churches United assigned Favers to the Dauphin County Prison, as the full-time Chaplain, from 1992 through August, 2003.  (Doc. 35-2, Ex. 1, Favers Dep. at p. pp. 11-12).  In his capacity as Chaplain, Favers would conduct worship services for members of the Protestant Faith, discussion groups which dealt with spiritual issues, one-on-one

4

sessions, and help supervise volunteers.  (Id.).  Although Favers' day-to-day activities were supervised by Warden DeRose and Deputy Warden Nichols, Favers was required to submit monthly reports to the Executive Director of Christian Churches United, as well as attend regular staff meetings and monthly staff meetings.  (Doc. 35-2, Ex. 1, Favers Dep. at pp. 93-94).  In the fall of 2003, Favers resigned his position as chaplain at the Dauphin County Prison.  (Id. at pp. 53-54).

Plaintiff, Gwendolyn Stubbs was an inmate in the Dauphin County Prison during the time Favers was Chaplain.  (Doc. 35-3, Ex. 2, Stubbs Deposition at p. 9).  She is currently confined in the State Correctional Institution, Muncy, Pennsylvania.  (Id.). Stubbs is married to Freddy Green.  (Id. at p. 32).

Sometime in 1997, Stubbs violated her parole and was recommitted to the Dauphin County Prison as a parole violator.  (Id. at p. 79- 80).  Stubbs, who was at the time confined in the Restricted Housing Unit, first came into contact with Defendant Favers in May, 1998, when her grandmother passed away, and Favers was called upon to offer counseling.  (Id. at pp. 78-79).  At that time, the parties began engaging in a consensual weekly sexual relationship.  (Id. at pp. 84- 85, 88-89).  Although the parties engaged in physical contact, they admit that they did not have sexual intercourse in the prison.  (Id. at p. 140, and Doc. 35-2, Ex. 1, Favers Dep. at p. 27).

On December 22, 1998, Stubbs was released from the Dauphin County Prison. (Id. at p. 92). The parties continued their relationship after Stubbs was released from the Dauphin County Prison. (Doc. 35-3, Ex. 2, Stubbs Dep. at p. 95). Stubbs would call Favers' house and talk to his wife or daughter and then ask for Favers. (Id. at p. 116). Favers took Stubbs and her daughter shopping and out to eat, (Id. at p. 112) and Stubbs would call Favers if she needed money, clothes, or anything that had something to do with money. (Id. at p. 115). He even paid her rent a couple of times. (Id.).

Stubbs was recommitted to the Dauphin County Prison in December, 1999 and released in April, 2000. (Id. at p. 95-96). In October, 2000, Stubbs was again incarcerated in the Dauphin County and released in January, 2001. (Id. at 98). Stubbs did not return to the Dauphin County Prison again until December 7, 2002, when she was recommitted as a parole violator. (Doc. 30, Ex. A, Intake Form). She was released on December 15, 2002. (Doc. 35-3, Ex. 2, Stubbs Dep. at p. 106). Stubbs returned to the Dauphin County Prison on April 23, 2003, as a parole violator. (Doc. 30, Ex. K, Intake Form). During the above times, Stubbs and Favers maintained a relationship. (Doc. 35-3, Ex. 2, Stubbs. Dep. at pp. 97-108). Their relationship ended in August, 2003. (Id. at pp. 108, 111).

During the course of their five year relationship, Stubbs never made a formal report to any prison official, (Id. at pp. 117-118); nor did she discontinue her relationship when

6

confronted with it by her husband.   (Id. at pp. 119-120).   Stubbs maintains that while in

prison she needed Favers because he was her emotional and physical support.   (Id. at p.

118).   Outside of prison, Stubbs did not end the relationship when confronted by her

husband, and states the following as her reason:

> I can honestly say that my husband is the type of man where whatever
> makes me happy, he loves my unconditionally, and if he - - he loves me that
> much to where he feels as though whatever makes you happy to keep you
> home, he'll do it.   Didn't approve of it, but what could he do?   He done go
> out and beat the man up, but then he'll go to jail.

(Id. at p. 120).   During the course of their relationship Defendant Favers never hit, kicked,

or physically abused Stubbs in any way.   (Id. at pp. 111).

In the fall of 2003, the Criminal Investigation Division of the Dauphin County

District Attorney's Office conducted an investigation into the parties' relationship.   (Doc.

35-2, Ex. 1, Favers Dep. at p. 20).   It was determined that, even though no criminal

charges [2] were going to be filed, it appeared that there had been inappropriateness on

---

2  Pursuant to 18 Pa.C.S.A. § 3124.2:

**(a) General rule.--** Except as provided in sections 3121(relating to rape), 3122.1
(relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual
intercourse), 3124.1 (relating to sexual assault) and 3125 (relating to aggravated
indecent assault), a person who is an employee or agent of the Department of
Corrections or a county correctional authority, youth development center, youth
forestry camp, State or county juvenile detention facility, other licensed residential
facility serving children and youth, or mental health or mental retardation facility or
institution commits a felony of the third degree when that person engages in sexual
intercourse, deviate sexual intercourse or indecent contact with an inmate, detainee,
patient or resident.

**(b) Definition.--** As used in this section, the term "agent" means a person who is
assigned to work in a State or county correctional or juvenile detention facility, a

Favers' part.  (Id.).   As a result of the investigation, Defendant Favers resigned his

position as Chaplain at the Dauphin County Prison.  (Id. at pp. 20-24).

Although their relationship ended in 2003, Stubbs still considers Favers a friend.

(Doc. 35-3, Stubbs Dep. at p. 151).  In 2004, Stubbs called Favers for a ride.  (Doc. 35-2,

Favers Dep. at  p. 72).  Favers refused to give here a ride, indicating that it was not wise

for them to continue the conversation.  (Id).  That was the last contact Defendant Favers

had with Gwendolyn Stubbs.  (Id. at p. 71).

## B.   Discussion

In order to assert a cognizable claim under § 1983, Stubbs must allege that some

person has deprived her of a federal right, and that the person who has caused the

deprivation acted under color of state or territorial law.  See American Mfrs. Mut. Ins. Co.

v. Sullivan, 526 U.S. 40, 49-50 (1999); Blessing v. Freestone, 520 U.S. 329, 340 (1997);

West v. Atkins, 487 U.S. 42, 48 (1988).   Thus, at the outset, it must be determined

whether Defendant Favers, a prison chaplain, could be considered a state actor.

The determination of state action under § 1983 is an issue of law to be determined

by the court.   See Blum v. Yaretsky, 457 U.S. 991, 997 (1982) (describing the question

---

youth development center, youth forestry camp, other licensed residential facility
serving children and youth, or mental health or mental retardation facility or
institution who is employed by any State or county agency or any person employed
by an entity providing contract services to the agency.

of "whether there is state action" as one of "several issues of law"); <u>Jennings v. Patterson</u>, 488 F.2d 436, 438 (5th Cir. 1974).  Defendant Favers, relying solely on the holding in <u>Montano v. Hedgepeth</u>, 120 F.3d 844, argues that he is not a state actor.  In <u>Montano</u>, the United States Court of Appeals for the Eighth Circuit concluded that, "a prison chaplain, even if a full-time state employee, is not a state actor when he engages in inherently ecclesiastical functions." <u>Id</u>. at 851. In doing so, the court distinguished those cases involving administrative and managerial tasks that might be attributable to the state. <u>Id</u>. Thus, Defendant argues that since the Plaintiff's claims against Favers are based on the performance of ecclesiastical, rather than administrative functions, her claims must fail. Although the United States Court of Appeals for the Third Circuit has not spoken on this very issue, this Court finds that there exists a persuasive line of cases that places a prison chaplain under color of state law.

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " <u>West v. Atkins</u>, 487 U.S. at 49 (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)). The Supreme Court has traditionally utilized a two-prong approach to assess the existence of state action:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State

> or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).

When private conduct is involved, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" Brentwood v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974)). The criteria for determining state action lack "rigid simplicity," and "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." Id. at 295, 296 (citing National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 193, 196 (1988); Polk County v. Dodson, 454 U.S. 312, 324-26 (1981)).

A challenged activity may be state action "when it results from the State's exercise of 'coercive power,' when the State engages in 'significant encouragement, either overt or covert,' or when a private actor operates as 'a willful participant in joint activity with the State or its agents.'" Id. at 296 (quoting Blum, 457 U.S. at 1004; Lugar, 457 U.S. at 941). State action can also occur when a "nominally private entity ... is controlled by an

'agency of the State,' " or when it has been delegated a public function by the State.  Id. (quoting Pennsylvania v. Board of Dirs. of City Trusts of Philadelphia, 353 U.S. 230, 231 (1957) (citing West, 487 U.S. at 56; Edmonson v. Leesville Concrete Co., 500 U.S. 614, 627-28 (1991))).   In addition, state action may be found when a private entity is " 'entwined with governmental policies' or when government is 'entwined in [its] management or control.' " Id. (quoting Evans v. Newton, 382 U.S. 296, 299, 301 (1966)). Thus, it is apparent that "the character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies." Id. (citing Lebron v. National R.R. Passenger Corp., 513 U.S. 374, 393-94 (1995)).  The Supreme Court has recognized that although an organization appears to be private, it may be an arm of the State through "winks and nods."  Id. at 301 n. 4 (stating that "if formalism were the *sin qua non* of state action, the doctrine would vanish owing to the ease and inevitability of evasion, and for just that reason formalism has never been controlling").

It is undisputed that prisoners do not entirely forfeit all constitutional guarantees by reason of their conviction and confinement.  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  Prisoners, as is well recognized, must be afforded "reasonable opportunities" to exercise their religious freedom guaranteed by the First Amendment.  Cruz v. Beto, 405

U.S. 319, 322 n.2 (1972).  In an attempt to afford inmates the guarantees under the First Amendment, in this case, the Dauphin County Prison contracted with defendant Favers' employer, Christian Churches United, to provide pastoral services to the inmate population.  Although Favers was employed by Christian Churches United,  his day-to-day activities were supervised by Warden DeRose and Deputy Warden Nichols at the Dauphin County Prison, where he worked full time, maintained an office, and was permitted to be present in areas of the prison that would be off-limits to members of the public.  His duties as full-time chaplain included conducting worship services for members of the Protestant Faith, as well as discussion groups which dealt with spiritual issues and one-on-one sessions, and helping supervise volunteers.  It is also undisputed that at the time of the parties' first encounter, Defendant Favers, in his capacity as chaplain, was offering counseling to Stubbs, who was grieving the loss of her grandmother.

Based on the foregoing, under either an entwinement analysis, or a delegated duty theory, this Court finds Favers, a full-time chaplain at the Dauphin County Jail, a state actor.  See Phelps v. Dunn, 965 F.2d 93, 102 (6th Cir.1992)[3].  In this instance, the

---

3      In Phelps, the court noted that the chaplain had signed an agreement to abide by all institutional policies and procedures, reported to the established line of chapel command, and was distinguishable from guest speakers and musicians who did not provide regularly scheduled services. See id.  Specifically, the volunteer chaplain was given privileges granted only to prison employees, "including special training and an institutional identification card."  Id.  Hence, although the chaplain retained the general attributes of a clergyman performing services in a non-prison setting, he was

Dauphin County Prison contracted with a private corporation to provide religious services to inmates, thereby delegating to the private entity the responsibility to provide religious services to inmates and in doing so, granting such entity broad access to the inmates when providing such services.  Having found state action, the Court must next assess whether the Plaintiff was deprived of a right secured by the Constitution and laws of the United States.  Sullivan, supra at 49-50.

An inmate who brings an action under 42 U.S.C. § 1983, alleging sexual assault or related claims, is generally alleging a violation of the conditions of confinement under the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 847 (1994).  A prison official violates an inmate's rights under the Eighth Amendment when two requirements are met. First, the official's conduct must be objectively serious or must have caused an objectively serious injury to the plaintiff. Farmer, 511 U.S. at 847.  Second, the prison official must have acted with deliberate indifference or reckless disregard toward the plaintiff's constitutional rights, health, or safety. Id.

A prison official's conduct is "objectively serious" under the Eighth Amendment if it is incompatible with "contemporary standards of decency." Helling v. McKinney,

---

acting under color of state law when conducting services in the prison setting. See id.  See also Paz v. Weir, 137 F.Supp.2d 782 (S.D.Tex.,2001), (holding that head chaplain at a county jail was acting under color of state law for purposes of § 1983, when interacting with a female inmate); Hobbs v. Pennell, 754 F.Supp. 1040 (D.Del.,1991)(E.D.Pa.)(holding that prison chaplain was appropriate defendant in § 1983 suit).

509 U.S. 25, 32 (1993) (citing Estelle v. Gamble, 429 U.S. 97, 103-104 (1976)).  That a

prison official acted with deliberate indifference or reckless disregard to an inmate's

constitutional rights, health, or safety is a subjective element that may be established by

showing that the prison official acted with a "sufficiently culpable state of mind." Farmer,

511 U.S. at 834.

Defendant Favers argues that the relationship between the parties was consensual,

and, as such, could not, and did not, result in the type of injury contemplated by the

Eighth Amendment.  (Doc. 26-1, p. 11).  Plaintiff counters by arguing that while the

Plaintiff entered into the acts with the defendant willingly, she was manipulated by him

because of his position as chaplain and the benefits she would receive from engaging in

activities with him.  (Doc. 33, p. 12).   Citing to Fisher v. Goord, 981 F.Supp. 140, 172

(W.D.N.Y. 1997), Plaintiff further argues that courts have recognized that sexual

interactions between correction officers and inmates, no matter how voluntary, are not

compatible with the order required in a prison setting and that an Eighth Amendment

claim can exist because an inmate may feel compelled to perform sexual favors for

correction officers.  (Doc. 33, pp. 11, 12).  Finally, Plaintiff argues that Defendant Favers

violated 18 Pa.C.S.A. § 3124.2, supra at n. 2.  (Doc. 33, p. 13).  This Court finds

Plaintiff's arguments unpersuasive.

Initially, and probably most notable, is the fact that based on Plaintiff's allegations, Defendant Favers was criminally investigated by the Criminal Investigative Division of the Dauphin County District Attorney' Office.  The allegations, along with evidence gathered during the investigation, failed to result in Defendant Favers being criminally charged and prosecuted.  However, even if the Court were to find that Favers violated the criminal statute, it is not within this Court's jurisdiction to review the decision of the Dauphin County District Attorney's Office, nor obviously can we criminally charge the Defendant.  Thus, the Court finds that Defendant's conduct is not now deemed an actionable violation of the Plaintiff's constitutional rights.  Even if the statute were intended to protect inmates, it "would not and ought not drive the determination of rights under the United States Constitution.  <u>Phillips v. Bird</u>, 2003 WL 22953175, *5 (D. Del. 2003).  As the Court in <u>Phillips</u> counseled, "elevating legal rights to the level of constitutional rights is an exercise fraught with the peril of unintended consequences." <u>Id</u>.

Further, the opinion in <u>Fisher</u> does not support the proposition cited by Plaintiff.  In <u>Fisher</u>, 981 F. Supp. at 172, the Western District of New York determined that the Plaintiff could not make a clear and substantial showing of a likelihood of success on the merits of her Eight Amendment claim.  That court found it notable that the plaintiff described the defendants as "friends." <u>Id</u>. at 144 and that the plaintiff's "own description

15

of her alleged sexual relationships with these [defendants] shows that they were consensual" <u>Id</u>. at 174.  Thus, the <u>Fisher</u> Court, relying on the holding in <u>Freitas v. Ault</u>, 109 F.3d 1335, 1339 (8th Cir. 1997)[4], found that "consensual sexual interactions between a correction officer and an inmate, although unquestionably inappropriate, and in this Court's view despicable, do not constitute cruel and unusual punishment under the Eighth Amendment".[5] <u>Id</u>.

Similar to the plaintiff in <u>Fisher</u>, Stubbs' own account of her sexual relationship in the instant action, with Defendant Favers, demonstrates that it too was consensual. Plaintiff indicated that at their first encounter, Defendant Favers "kissed and fondled me" and she did nothing about it, because, "[when] you like something, you're not going to stop it."  (Doc. 35-3, Ex. 2, Stubbs Dep. at pp. 84, 85).  Plaintiff then engaged in a five

---

4  In <u>Freitas</u>, the United States Court of Appeals for the Eighth Circuit found that "welcome and voluntary sexual interactions, no matter how inappropriate, cannot as a matter of law constitute 'pain' as contemplated by the Eighth Amendment."

5  The Court, in dicta, noted that "it is now the law in New York that sexual relations of any kind between an inmate and a correction officer constitute statutory rape. N.Y. Penal L. § 130.05(3)(e). This law was not in effect, however, at the time of the alleged misconduct in this case. Indeed, the fact that it was necessary to enact such a law, combined with the lack of evidence of any prior prohibition, would indicate that, before the new law's passage, an inmate could, as a matter of law, consent to sexual relations with a correction officer.  The wisdom of this new law is manifest. It draws a "bright line" between acceptable and unacceptable conduct. Sexual interactions between correction officers and inmates, no matter how voluntary, are totally incompatible with the order and discipline required in a prison setting. Further, the Court is disturbed by the notion that an inmate might feel compelled to perform sexual favors for correction officers in order to be on the officer's "good side." Such *quid pro quo* behavior is inappropriate, despicable and serves no legitimate penological purpose." <u>Fisher</u>, 981 F. Supp. at 175.

year sexual relationship, both inside and outside of prison, with Defendant Favers.  (Id. at pp. 88, 107, 108).  She admitted that for the "first couple of years, I could say I thought I loved him.  But the last year or two we were together, I would say he changed." (Id. at 91).  Plaintiff, however, did not break off the relationship.  When asked if she ever made a formal complaint regarding the relationship, and if not, why, Stubbs replied "No, I never tried to.  I needed him. [To] take care of me.  He was my emotional support while I was there.  Emotional, physical, whatever you want to call it." (Id. at p. 118).  Nor did Plaintiff end the relationship, when confronted about it by her husband.  (Id. at p. 120).

While Plaintiff attempts to argue that  she was manipulated by Favers because of his position as chaplain, the record demonstrates that Plaintiff at times derived substantial benefits from the relationship.  While in prison, she was allowed to use the phone, "got extra food, when [Favers] would go out to lunch, he would bring something back and [Plaintiff] would eat it in the office with him, and other inmates didn't get that." (Id. at p. 139).  While out of prison, Favers took Stubbs and her daughter shopping and out to eat, (Id. at p. 112), would give Stubbs money and clothes, and even paid her rent a couple of times. (Id. at p. 115).  At no time during their relationship did Favers ever harm the Plaintiff.  In fact, despite the demise of their relationship and remarkably considering she has joined him as a Defendant in the instant action, Stubbs still considers Favers a friend. (Id. at p. 151).  There is absolutely no evidence of record that Plaintiff engaged in sexual

17

acts with defendant Favers against her will, or that a coercive *quid pro quo* scheme was in place. In a case such as this, where prison conditions are challenged, the Eighth Amendment "has been interpreted to require ... that the inmates are free from the 'unnecessary and wanton infliction of pain .'" Hassine v. Jeffes, 846 F.2d 169, 174 (3d Cir.1988) (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)); accord Gibbs v. Cross, 160 F.3d 962, 966 (3d Cir.1998).  There is also no evidence of record that Favers' conduct caused Plaintiff any pain or other injury. The record is undisputed that Stubbs voluntarily and willingly had sex with Favers in and out of prison. Consensual sex between two adults does not constitute cruel and unusual punishment simply because it occurs within the walls of a prison.  Phillips, 2003 WL 22953175, *6.  Thus, the Plaintiff has failed to present evidence from which a reasonable jury could conclude that Defendant Favers' conduct caused an objectively serious injury to the plaintiff.   In reaching this conclusion we have applied not only the law but a healthy dose of common sense as well.  As such, this Court need not consider the subjective test of whether Defendant Favers acted with deliberate indifference to Plaintiff's constitutional rights, health, or safety.  Defendant Favers is entitled to summary judgment as a matter of law.

## III.   **Defendant Walizer's Motion for Summary Judgment**

### A.   **Statement of Facts**

From the pleadings, depositions and exhibits submitted therewith, the following facts can be ascertained as undisputed.

On December 7, 2002, Plaintiff, Gwendolyn Stubbs was committed to the Dauphin County Prison as a parole violator.  (Doc. 30-2, Ex. A, Intake Form).   On December 8, 2002, Stubbs was seen in the lobby, by the medical department, as a new intake.  (Doc. 30-2, Ex. B, Dispensary Card).   Stubbs was pregnant and reported a due date of December 30, 2002. (Id.).

On December 12, 2002, at 7:30 p.m., the medical department was called to K Block by security staff.  (Id.).  Stubbs' pants were wet and she was complaining of labor.  (Id.).  She stated that "she was 5cm last week" and that she believed that her "water broke." (Id.).  Although Stubbs appeared in no apparent distress or discomfort, the doctor was notified by phone.  (Id.).  Stubbs was then transported to the emergency room of the Harrisburg Hospital for evaluation.  (Id.).   At 10:20 p.m., Stubbs returned from the Harrisburg Hospital.  (Id.).  She exhibited no signs of labor or distress.  (Id.).   She was covered in urine.  (Id.).  Because Stubbs was returned without paperwork, the medical department contacted the Harrisburg Hospital to have the paperwork faxed to the prison.  (Id.). At 11:00 p.m., the paperwork was received and placed in Stubbs' chart.  (Id.).  The medical department then spoke with the nurse at the Harrisburg Hospital who took care of Stubbs.  (Id.).  The hospital nurse reported that Stubbs' membranes had not ruptured

and that the baby had not yet engaged.  (Id.). It was noted that the medical department would continue to monitor Stubbs.  (Id.).

On December 13, 2002, at 3:45 a.m., the medical department checked with the Block officers during medicine pass to see how Stubbs was doing.  (Id.).  It was reported that Stubbs had an episode of voiding on herself since her return from the hospital and her clothing was wet with urine.  (Id.).  Stubbs was offered clothes and was resting at the time of medicine pass.  (Id.).

On December 14, 2002, at 7:00 p.m., Stubbs came to pill call with a pad box stating that she was spotting.  (Id.).  Nothing was noted, and Stubbs ambulated back to the block without any difficulty.  (Id.).

On December 14, 2002, Correctional Officers Galford, Langan, Hockenberry, Walizer and Gragg worked the 10:00 p.m. - 6:00 a.m. shift. (Doc. 30-2, Ex. D, Log Book).  CO Walizer was the K-Day room officer, responsible for monitoring 14 inmates, including Stubbs.  (Doc. 30-2, Ex. F, Walizer Dep. at p. 24).   As soon as Walizer came on duty for her shift, Stubbs told Walizer that she needed to go to the hospital because she was in labor.  (Id. at p. 29).  By 10:20 p.m., CO Walizer advised K-Control Officer Galford, who called the medical department.  (Id. at pp. 17-18).  Walizer started counting Stubbs' contractions sometime between 10:15 p.m. and 11:30 p.m.  (Doc. 30-2, Ex. F, Walizer Dep. at p. 16; Doc. 40-1, Ex. 1, Stubbs' Dep. at p. 51).  Nurse Ken Krepps

responded and came to see Stubbs.  (Id. at p. 18, 19).  He asked her a series of standard questions.  (Id. at p. 21).  Nurse Ken contacted Dr. Jackson by phone, who ordered a more thorough evaluation.  (Id. at p. 22-24).  Nurse Ken told Walizer that Dr. Jackson required consistent contractions or the water breaking before releasing or ordering the inmate to be sent to the hospital.  (Id. at pp. 29-30).

On December 15, 2002, at approximately 2:00 a.m., the medical department received a call from C.O. Pauline Galford, K-Control Officer, reporting that Stubbs claimed to be in "lots of pain", with contractions and was upsetting all of K dayroom. (Doc. 30-2, Ex. C, Dispensary Card; Ex. D, Report of Extraordinary Occurrence). Stubbs, assisted by CO Galford,  ambulated to medical, where she stated the she was having pain from her lower back around to her stomach, as well as contractions.  (Doc. 30-2, Ex. C, Dispensary Card).  She was assessed by Nurse Ken Krepps, who noted that her abdomen was soft and when she stated she was having a contraction, her entire stomach region was palpated and no contraction was felt.  (Id.).  It was noted that Stubbs' clothes were dry.  (Id.).  Stubbs was instructed to lay on her side or to walk to help with any discomfort, or to call medical if she experienced any more problems.  (Id.).  The medical department was again notified at 2:54 a.m. and 3:08 a.m.  (Doc. 30-2, Ex. D, Log Book and Report of Extraordinary Occurrence).

At approximately 3:00 a.m., Walizer told Stubbs she would call the medical department.  (Doc. 40-2, Ex. 1, Stubbs Dep. at p. 54).  At approximately 3:10 a.m., the medical department received a call from K-control, reporting that Stubbs was shouting that she was in pain and was upsetting the dayroom.  (Doc. 30-2, Ex. C, Dispensary Card.).  Nurse Ken Krepps responded and "again felt for contractions, nothing noted." (Id.).  It was noted that Stubbs' stomach was soft and flabby, with no incontinence noted. (Id.).

At approximately 4:45 a.m., Stubbs went into the bathroom and felt "[her] placenta coming out."  (Doc. 40-2, Ex. 1, Stubbs Dep. at p. 56).  Stubbs then walked back to her bunk and took off all her clothes.  (Id. at p. 57).  CO Walizer "came running in" and asked Stubbs' what was wrong.  (Id.).  While the medical department was doing pill call, K-control called and stated that Stubbs had pulled down her pants and was trying to push. (Doc. 30-2, Ex. C, Dispensary Card.).  Nurse Krepps went to K dayroom where Stubbs was lying on her bunk trying to push.  (Id.).  The nurse examined her and found her abdomen to be soft and flabby with not sign of incontinence or water breaking and that it felt like the baby was "high mid abdomen."  (Id.).  No contractions were felt or seen. (Id.).  Stubbs was instructed not to push and to relax, and to call medical if any further problems.  (Id.).  Despite being advised not to push and to relax, Stubbs "proceeded to start pushing to try to break [her] water."  (Doc. 40-2, Ex. 1, Stubbs Dep. at p. 57).

Stubbs states that it took her "til about quarter after 5:00 to break the placenta and for it to come out, because it was coming out whole." (Id.).

At approximately 5:30 a.m., CO Walizer requested CO Langan, who has had "different training" than CO Walizer, take a "look at Stubbs." (Doc. 30-2, Ex. D, Memorandum of CO Langan; Ex. F, Walizer Dep. at pp. 33-35). CO Langan observed a dark object protruding from Stubbs' vagina. (Doc. 30-2, Ex. D, Langan Memo). He then told CO Galford to relay this information to the medical department. (Id.). The medical department notes that it received a call at 5:30 a.m., from K-control, reporting that Stubbs was still pushing and that it felt like the baby was coming out. (Id.). At 5:38 a.m. Stubbs, aided by C.O. Walizer and inmate Lisa Hull, gave birth to a baby boy. (Doc. 30-2, Ex. D, Description of Extraordinary Occurrence; Ex. F, Walizer Dep. at 36-38). C.O. John Langan , C.O. Joanna Hockenberry, C.O. Thomas Gragg assisted with controlling the dayroom inmates and with clearing the baby's airways. (Id.). Nurses Ken Krepps and Jim Yanick arrived immediately and assessed. (Id.). Once Nurses Krepps and Yanick arrived, CO Walizer "stepped off the block ", only to return to the block to complete her paperwork regarding the incident. (Doc. 30-2, Ex. F, Walizer Dep. at p. 40).

When Nurses Krepps and Yanick arrived, the baby had already been delivered in the bunk and was on Stubbs' lap. (Doc. 30-2, Ex. C, Dispensary Card.). Nurse Krepps

noted that it was a "baby boy crying, good color."  (Id.). The baby's nose and mouth were  suctioned and the baby was covered with a pillow case.  (Id.).  At 5:42 the umbilical cord was clamped and the ambulance was called.  (Id.). It was noted that the baby was trying to open its eyes and an occasional sneeze was noted.  (Id.).  At 5:45 a.m., a call was placed to Dr. Hoffman, who informed the nurse to keep the baby warm and call an ambulance.  (Id.).  At 5:57 a.m., the ambulance crew arrived on the block and cut the umbilical cord and the placenta was expelled. (Id.).  The medical department then ruled out any complications secondary to child birth.   (Doc. 30-2, Ex. E, Medical Incident/Injury Report).  At approximately 6:20 a.m., Stubbs and the baby were placed on a litter and transported to the Harrisburg Hospital. (Id.).  On December 15, 1002, the Parole Board released Stubbs from the Dauphin County Prison. (Doc. 30-2, Ex. D, Release Notification).

## B.   <u>Discussion</u>

The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999)(<u>citing</u> Estelle vs. Gamble, 429 U.S. 97 (1976)). In order to establish a claim based on the Eighth Amendment, an inmate must allege acts or omissions by prison officials sufficiently harmful to evidence deliberate indifference to a serious medical

need.  See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003).

In the context of medical care, the relevant inquiry is whether the defendant was: (1) deliberately indifferent (the subjective element) to (2) plaintiff's serious medical needs (the objective element). Monmouth County Correctional Institution Inmates vs. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987); West v. Keve, 571 F.2d 158, 161 (3d Cir. 1979). Because only egregious acts or omissions can violate this standard, mere medical malpractice can not result in an Eighth Amendment violation, nor can disagreements over a prison physician's medical judgment. White v. Napoleon, 897 F.2d 103, 108-10 (3d Cir. 1990).

A complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment..." Estelle v. Gamble, 429 U.S. 97, 106, (1976).  "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice." Id., 429 U.S. at 107. "Allegations of medical malpractice are not sufficient to establish a Constitutional violation." Spruill, 372 F.3d at 235.  "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).  In sum, negligence,

unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment.  Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).  See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician.  Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996).  The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer v. Carlson, 685 F. Supp. at 1339.

The objective component of an Eighth Amendment claim, i.e., whether a plaintiff's medical needs were serious, has its roots in contemporary standards of decency. Hudson v. McMillian, 503 U.S. 1 (1992).  A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Johnson v. Busby,

953 F.2d 349, 351 (8th Cir. 1991); Monmouth County Correctional Institution Inmates

v. Lanzaro, 834 F.2d at 347; Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert.

denied, 450 U.S. 1041 (1981); West v. Keve, 571 F.2d 158, 162-63 n.6 (3d Cir. 1978).

The serious medical need element contemplates a condition of urgency, one that may

produce death, degeneration, or extreme pain.  See Monmouth County Correctional

Institution Inmates v. Lanzaro, 834 F.2d at 347; Archer v. Dutcher, 733 F.2d 14, 16-17

(2d Cir. 1984); Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977).  Not every injury or

illness invokes constitutional protection -- only those that are serious have that effect.

Additionally, a non-physician defendant cannot be considered deliberately indifferent for

failing to respond to an inmate's medical complaints when the inmate is already receiving

treatment from the prison's medical staff.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d

Cir. 1993).

Plaintiff attempts to impose liability on Defendant Walizer for her alleged

indifference to Plaintiff's serious medical needs.  Specifically, Plaintiff claims that her

complaints to Walizer of being in severe pain, on the evening of December 14, 2002,

went unanswered and that Walizer "told plaintiff that she was not in labor".  (Doc. 1,

Complaint).  A review of the documentation of record, however, reveals meaningful

efforts on the part of CO Walizer, a non-physician, in attending to Plaintiff's medical

needs.  Plaintiff, herself, states that Walizer contacted the medical department to report

Plaintiff's pain, timed her contractions, and checked on her status every hour. (Doc. 40-2, Ex. 1, Stubbs. Dep. at pp. 51, 54).   Moreover, the record reveals that the medical department was contacted seven times during CO Walizer's eight hour shift, (Doc. 30-2, Exs. B, C, D) and a nurse physically examined Stubbs five times. (Id.).  Dr. Jackson, the attending physician was notified by the nurse and it was his professional judgment that the contractions be on a more consistent basis or, that the Plaintiff's water break, before Plaintiff would be sent the hospital.  (Doc. 30-2, Ex. F, Walizer Dep. at pp. 22-24, 29-30). The record is clear that Stubbs was receiving medical treatment from medical professionals.   To the extent that Stubbs disagreed with the medical professionals' judgment, such can not serve as a predicate to liability under § 1983.  Hudson v. Palmer, 468 U.S. 517 (1984); White, 897 F.2d at 108-10 (3d Cir. 1990); Farmer, 685 F. Supp. at 1339 (M.D. Pa. 1988).  Thus, Plaintiff has failed to present any evidence from which a reasonable jury could conclude that the Defendant Walizer possessed the culpable mental state necessary for Eighth Amendment liability to attach.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d at 346; West v. Keve, 571 F.2d at 161. Moreover, the Court finds that Defendant Walizer appropriately relies on Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993), in seeking summary judgment, as she is a non-physician who knew Stubbs was receiving

treatment by the medical department at the Dauphin County Prison.  <u>Id</u>.  Thus, Defendant

Walizer is entitled to judgment as a matter of law.

An appropriate Order shall issue.